Submitted on respondent's petition for reconsideration filed March 22, appellant's response to petition for reconsideration filed July 3, brief of *amicus curiae* Oregon District Attorneys Association filed June 15, and brief on reconsideration of *amicus curiae* Oregon Criminal Defense Lawyer's Association filed July 3, reconsideration allowed; former opinion (203 Or App 683, 126 P3d 1241) and disposition modified; affirmed September 13, petition for review denied December 19, 2006 (342 Or 253)

# STATE OF OREGON,
*Respondent,*

*v.*

# YVONNE MARIE AYERS,
*Appellant.*

### 9602-30961; A119880

143 P3d 251

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Janet A. Klapstein, Senior Assistant Attorney General, for petition.

Erin G. Rohr and Chilton, Ebbett & Rohr, LLC, for response.

Scott Heiser for *amicus curiae* Oregon District Attorneys Association.

Rankin Johnson IV and Law Office of Rankin Johnson IV, LLC, and Rebecca Davis and James A. Arneson PC for *amicus curiae* Oregon Criminal Defense Lawyer's Association.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

HASELTON, P. J.

## HASELTON, P. J.

The state petitions for reconsideration of our decision in *State v. Ayers*, 203 Or App 683, 126 P3d 1241 (2006), arguing that reconsideration is warranted to address several problems with our opinion. This case concerns the statutory right to a speedy trial pursuant to ORS 135.747 on charges pending in Oregon, when a defendant is incarcerated in another jurisdiction. In our prior opinion, we held that factual issues remained to be resolved and that the resolution of defendant's motion to dismiss for lack of a speedy trial depended on when Oregon lodged a detainer pursuant to the Interstate Agreement on Detainers (IAD)[1] with the Washington facility in which defendant was incarcerated, and on when defendant became aware of that detainer. For the reasons set forth below, we modify our former opinion and disposition, and affirm defendant's felon in possession of a firearm conviction. ORS 166.270.

We repeat and readopt the following preliminary statements of fact from our prior opinion:

"On February 15, 1996, defendant was indicted in Multnomah County on two counts of being a felon in possession of a firearm, ORS 166.270, and two counts of possession of a controlled substance, ORS 475.992(4)(a), (b). Defendant was arraigned on February 23, and, on March 5, she entered into a pretrial release agreement with the state. Shortly thereafter, defendant absconded, and, on March 18, 1996, the Multnomah County Circuit Court issued a warrant for her arrest for failure to comply with the terms of her conditional release.

"Oregon authorities were unaware of defendant's whereabouts for approximately two years. However, in March 1998, Washington authorities notified the Multnomah County District Attorney's Office that defendant had been charged with crimes and was in custody in Pierce County, Washington. Shortly thereafter, the district attorney's office sought and obtained a governor's warrant to initiate defendant's extradition. *See* ORS 133.743-133.857. On

---

[1] The IAD is codified in Oregon at ORS 135.775. We refer to its provisions throughout this opinion by Article rather than by Oregon statutory citation because this case involves both Washington's and Oregon's application of the IAD.

June 16, 1998, Washington authorities notified the Multnomah County Sheriff's Office that defendant had been convicted and sentenced to 109 months' imprisonment and that she was being transferred to the state women's correctional center in Gig Harbor, Washington. The Washington notification also stated that the extradition proceeding was being dismissed and that Oregon officials should lodge a detainer against defendant at the Gig Harbor facility. On June 17, defendant was moved to Gig Harbor, and, on June 18, the extradition proceeding was dismissed."

*Ayers*, 203 Or App at 685-86 (footnote omitted).

In light of the state's petition for reconsideration, we have carefully reexamined the record and have concluded, for the reasons that follow, that we misunderstood and therefore mischaracterized certain evidence in the record.

In our prior opinion, we indicated that a factual dispute existed as to whether the State of Oregon ever lodged a detainer against defendant while she was incarcerated at the Gig Harbor facility. *Id.* at 686. We noted that the state had offered into evidence "a cover letter * * * indicating that that office had sent a detainer to the Gig Harbor facility on June 22, 1998." *Id.* We further stated, "[T]he letter indicates that other items, possibly including a detainer, were sent with it." *Id.* We went on to conclude that the record contained conflicting evidence as to whether Oregon had lodged a detainer against defendant in 1998, noting in particular defendant's testimony that Washington prison officials did not notify her of any detainer at that time, a defense investigator's conclusion that "the detainer was not in" a file she had requested from Washington officials, and our belief that one of the IAD forms ultimately filled out by a Washington official pursuant to the IAD "arguably" indicated that no detainer had been filed. *Id.* at 687-88. Ultimately, we concluded that

"defendant's entitlement to dismissal under ORS 135.747 depends on the resolution of two disputed factual matters: (1) When, if ever, did Multnomah County authorities lodge a detainer against defendant at the Gig Harbor facility? And (2) when, if ever, after the lodging of any detainer, did defendant, who was unrepresented, have a sufficient

awareness of the detainer and of her entitlement under the IAD to request a final disposition of the Oregon charges?"

*Id.* at 703. On reconsideration, the state raises various points, both factual and legal. We address the factual matters first.

■ First, the state argues, we made a factual error in concluding that the record indicated that a "cover letter" had been sent to the Washington facility that "possibly includ[ed] a detainer" with it, *id.* at 686, and that factual error affected our legal analysis and ultimate resolution of the case. The state posits that what we described as a "cover letter" was, in fact, a detainer. The state notes that a "detainer" is not a specific form, but simply is "a request by the State's criminal justice agency that the institution in which the prisoner is housed hold the prisoner for the agency or notify the agency when release is imminent." *New York v. Hill*, 528 US 110, 112, 120 S Ct 659, 145 L Ed 2d 560 (2000). Defendant responds that the "cover letter" does not satisfy that definition, because it does not specify that Oregon wanted the Washington facility to hold defendant or to notify Oregon when her release was imminent.

On reconsideration, we agree with the state that our characterization of the letter as a document that may have been accompanied by a detainer was incorrect. The letter was addressed to the Washington facility in which defendant was being held, identified defendant by name, date of birth, and description, and further provided, "The above subject is in your custody. Please use the enclosed documents to lodge a detainer against subject in our behalf. We will extradite." The letter indicated that enclosures were included: certified copies of specific warrants, certified copies of the charging instrument, certified copies of defendant's fingerprints, and certified copies of photographs. We are convinced, on reconsideration, that the letter itself functioned as a detainer.[2] Although it did not, as defendant points out, specifically request the institution to "hold" defendant or to

---

[2] We note that the state's witness from the office that sent out that document described it as a "detainer letter."

notify Oregon when her release was imminent, the information concerning outstanding charging instruments pending in Oregon, instructions to "lodge a detainer," and the specification that Oregon "will extradite" served to inform Washington that Oregon was requesting that defendant be held for prosecution on the Oregon charges.

In light of our determination that the letter in question *was* a detainer, we must reevaluate our conclusion that a factual issue remained unresolved as to "[w]hen, if ever, did Multnomah County authorities lodge a detainer against defendant at the Gig Harbor facility?" *Ayers*, 203 Or App at 705. The state presented evidence that the detainer with accompanying documents was mailed to the Gig Harbor facility on June 22, 1998, and was not returned as undelivered. The trial court found that the letter was sent, and defendant does not challenge that finding on appeal.

Defendant testified that, although she knew of the outstanding Oregon warrant and had refused to waive extradition on that warrant, she received no information about the detainer until she made a specific inquiry to a Washington prison official, Vickers, in 2002. On April 18, 2002, defendant and Vickers prepared a request for disposition of the Oregon charges pursuant to Article III of the IAD, as discussed in more detail below. A defense investigator testified on defendant's behalf that she called Vickers to inquire about detainers that had been lodged against defendant. When asked if Vickers had stated whether a detainer had been placed on defendant in 1998, the investigator responded, "He did not say that a detainer had been filed on or lodged against Ms. Ayers." The investigator further testified that she had requested a copy of everything in defendant's Washington file but "the detainer was not in that."

In our prior opinion, we concluded that that evidence, as well as the contents of one of the IAD forms filled out by defendant and Vickers in 2002, suggested that the evidence was in conflict as to whether Oregon had ever lodged a detainer against defendant while she was at Gig Harbor. *Id.* at 686. In its petition for reconsideration, the state suggests that we misunderstood the record in regard to the IAD forms. Again, on reconsideration, we agree with the state that we

were mistaken in stating that one of the IAD forms arguably supported defendant's contention that no Oregon detainer existed. In our prior opinion, we stated:

"[O]ne of the IAD forms that defendant and Vickers completed on April 18, 2002, also arguably corroborates the view that, as of that date, no detainers had been lodged against defendant at Gig Harbor. Vickers completed Form III and, in response to item number 8 of that form, which directs the custodial authority to list any '[d]etainers currently on file against this inmate,' Vickers wrote, 'None Known.'[2]

---

"[2] It is unclear why, if there were no detainers lodged against defendant, Vickers provided her with IAD forms. Article III of the IAD, ORS 135.775, becomes operative only if 'there is pending in any other party state any untried indictment * * * on the basis of which a *detainer has been lodged against the prisoner*[.]' "

*Id.* at 687-88, 688 n 2 (emphasis and ellipsis in original).

On reconsideration, we conclude that neither the form in question nor any other evidence in the record supports an inference that no detainer had ever been lodged against defendant. Rather, after viewing *all* of the IAD forms that Vickers and defendant filled out, and considering them in light of the provisions of the IAD set forth below and the other evidence in the record, we conclude that the evidence supports only a conclusion that Oregon *had* lodged a detainer against defendant at the Gig Harbor facility.

We begin with an overview of the relevant provisions of the IAD. Article I of the IAD indicates that its policy is "to encourage the expeditious and orderly disposition of" charges outstanding in other jurisdictions against prisoners. Article II provides various definitions that are not pertinent to the issues at hand. Articles III, IV, and V, however, must be viewed together in order to understand the mechanics of how those serving sentences in one jurisdiction may be brought to trial in another jurisdiction.[3]

---

[3] Article IV concerns the means by which a state may initiate the return of a prisoner serving time in another state to face charges. Oregon did not invoke the provisions of Article IV in the present case.

Article III provides the mechanism by which an inmate against whom an out-of-state detainer has been lodged may initiate his or her transfer to the other jurisdiction for disposition of the pending charges. Article III(c) provides that the institution in which the prisoner is incarcerated "shall promptly inform the prisoner of the source and contents of any detainer lodged against the prisoner and shall also inform the prisoner of the right to make a request for final disposition of the indictment, information or complaint on which the detainer is based." Article III(a) provides that a prisoner against whom "a detainer has been lodged" may make a request for final disposition of the indictment, information, or complaint, and that "the prisoner shall be brought to trial within 180 days" after such request is delivered to the proper authorities in the state that lodged the detainer. Article III(a) further provides that, when a prisoner has made a request pursuant to that provision, it "shall be accompanied by a certificate of the appropriate official having custody of the prisoner" giving information pertaining to the sentence that the prisoner is serving. Article III(b) provides:

"The written notice and request for final disposition referred to in paragraph (a) of this Article shall be given or sent by the prisoner *to the warden or other official having custody of the prisoner, who shall promptly forward it together with the certificate to the prosecuting official and court by registered or certified mail, return receipt requested.*"

(Emphasis added.)

Article III(d) contains what the state describes as an "anti-shuttling provision" that, if a prisoner has made any request for a final disposition pursuant to Article III(a), that request "shall operate as a request for final disposition of all untried indictments, informations or complaints on the basis of which detainers have been lodged against the prisoner from the state to whose prosecuting official the request for final disposition is specifically directed." Article III(d) further requires that the institution in which the prisoner is incarcerated shall "notify all appropriate prosecuting officers and courts in the several jurisdictions within the state to which the prisoner's request for final disposition is being sent of the

proceeding being initiated by the prisoner." Finally, Article III(d) provides that, if the prisoner is not tried "on any indictment, information or complaint contemplated hereby prior to the return of the prisoner to the original place of imprisonment, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."

Those provisions must be read in conjunction with the following provision of Article V(a):

"In response to a request made under Article III or Article IV of this agreement, the appropriate authority in a sending state shall offer to deliver temporary custody of such prisoner to the appropriate authority in the state where such indictment, information or complaint is pending against such person in order that speedy and efficient prosecution may be had. *If the request for final disposition is made by the prisoner, the offer of temporary custody shall accompany the written notice provided for in Article III of this agreement.*"

(Emphasis added.)

In light of those provisions, we examine the IAD forms in the record. Each of the forms (denominated Form I through Form IV) is imprinted with the logo of the Washington Department of Corrections (DOC), headed with the words "Agreement on Detainers," and was signed in the area of the form denominated "custodial authority" by Rannie Vickers, Correctional Records Manager II. Those forms were sent to Multnomah County by certified mail by the Washington DOC.

Form I is addressed to defendant, provides in part, "you are hereby informed that the following are the untried indictments, information, or complaints against you concerning which the undersigned has knowledge," and then lists the Multnomah County charges at issue in the present case. It goes on to summarize in detail defendant's rights under Article III of the IAD, and instructs defendant how to request final disposition of the charges by notifying the superintendent of the institution. That form was signed by Vickers and by defendant on April 18, 2002.

Form II is addressed to the District Attorney of Multnomah County and was signed by defendant and witnessed by Vickers on April 18, 2002. It specifically requests "that a final disposition be made of the following indictment, information, or complaints now pending against me," lists the charges at issue in the present case, and indicates that "[t]he required Certificate of Inmate Status and Offer of Temporary Custody are attached."

Form III is entitled "Certificate of Inmate Status," signed by Vickers, that certifies the amount of time defendant had already served on her Washington sentence, the time remaining to be served, and her parole eligibility date. It further provides, "Detainers currently on file against this inmate from your state are as follows: None known." This form contains a distribution notation at the bottom indicating that, in cases in which an inmate has requested disposition of charges pursuant to Article III of the IAD, the form should accompany Form II, and that copies "should also be sent to all other prosecutors in the same state who have lodged detainers against the inmate."

Form IV, also signed by Vickers, is denominated an "Offer to Deliver Temporary Custody," and is addressed to the District Attorney of Multnomah County, indicating that, pursuant to Article V, the Washington DOC "hereby offers to deliver temporary custody of the above-named inmate to the appropriate authority in your state in order that speedy and efficient prosecution may be had" on the specified Multnomah County charges.

In our prior opinion, we stated that it was "unclear why, if there were no detainers lodged against defendant, Vickers provided her with IAD forms." *Ayers*, 203 Or App at 688 n 2. On reconsideration, we reexamine our conclusion that Vickers may have simply provided defendant with IAD forms for unknown reasons. While it might be accurate to say that Vickers "provided" defendant with Form II, in which defendant requested disposition of the Oregon charges, Forms I, III, and IV were documents in which Vickers, as an official of Washington DOC, initiated specific procedures pursuant to Articles III and V of the IAD to facilitate the resolution of the Oregon charges at issue in this case.

■■ At this point, we note the pertinence of certain evidentiary presumptions. An evidentiary presumption is "a rule of law requiring that, once a basic fact is established, the factfinder must find a certain presumed fact, in the absence of evidence rebutting that presumed fact." *Massee and Massee*, 328 Or 195, 203 n 3, 970 P2d 1203 (1999). There is a presumption that an "[o]fficial duty has been regularly performed." OEC 311(1)(j). As the Oregon Supreme Court explained in *State v. Clay*, 332 Or 327, 332-33, 29 P3d 1101 (2001), that presumption applies in situations in which an official is *required* to perform a duty, rather than merely having the discretionary authority to perform an act. Here, Articles III(a), III(b), and V(a) *required* Vickers to process defendant's request for final disposition made pursuant to Article III(a) in the event that a detainer had been lodged against defendant. Moreover, the IAD contains *no* provisions for officials in the state in which a prisoner is incarcerated to process the certification and offer to deliver temporary custody pursuant to Articles III(a) and V(a) in situations in which no detainer has been lodged. *See, e.g., State v. Coffman*, 59 Or App 18, 22, 650 P2d 144 (1982) (state's obligations under IAD do not arise until a detainer based on an untried indictment, information, or complaint is lodged); *State v. Anderson*, 121 Wash 2d 852, 861, 855 P2d 671 (1993) (same).

In summary, there was evidence that in 1998, through a letter sent to the Gig Harbor facility in which defendant was incarcerated, an Oregon detainer was lodged concerning the outstanding charges in Multnomah County that are at issue here. There was evidence that, in April 2002, Vickers, pursuant to Form I described above, informed defendant of those outstanding charges and advised her of her rights under the IAD. Defendant then invoked her rights pursuant to Article III(a) of the IAD to have those charges resolved (Form II), and Vickers filled out the paperwork to process her request (Forms III and IV) and mailed it to Oregon pursuant to his obligations under Articles III(a), III(b), and V(a). There was *no* evidence that any detainer, other than the one from 1998 described above, was ever lodged against defendant at the Gig Harbor facility.

At this point, another evidentiary presumption bears mention: "The law has been obeyed." OEC 311(1)(x). As

explained below, we conclude that nothing in the record supports an inference that Vickers, in processing defendant's IAD paperwork in 2002, failed to obey the law.[4] Indeed, evidence in the record, *e.g.*, the IAD forms themselves that contained specific information relating to the pending Multnomah County charges, supports an inference that Vickers *was* acting on a detainer.[5] That is, nothing in the record suggests that Vickers erroneously processed the IAD forms in the absence of *any* detainer having been lodged against defendant.

We further conclude—contrary to our suggestion in our original opinion, *see Ayers*, 203 Or App at 687-88—that no evidence in this record contradicts a determination that the 1998 Multnomah County detainer was, in fact, lodged against defendant at the Gig Harbor facility. In particular, the evidence presented by the defense investigator does not support a conclusion that Vickers initiated IAD procedures on defendant's behalf despite the lack of any detainer: In response to a question about whether Vickers told the investigator "whether a detainer had been placed on [defendant] in 1998," the investigator testified that Vickers "*did not say* that a detainer had been filed on or lodged against" defendant. (Emphasis added.) The investigator further testified that she requested the contents of "all their records" and concluded that "the detainer was not in that." That Vickers did not tell an investigator during a telephone conversation that a detainer had been lodged against defendant in 1998 does not support an inference that Vickers initiated IAD procedures in violation of the IAD in the absence of any detainer.

---

[4] We note that defendant *did* present evidence to rebut any such presumption as to whether Washington officials carried out their duties pursuant to Article III(c) to "promptly inform" her of the existence of the detainer in 1998. That issue is discussed in more detail below. 207 Or App at 691.

[5] The information included by Vickers on the IAD forms described above does not match the information contained in the Governor's warrant that was dismissed when defendant was moved to the Gig Harbor facility, and thus the record does not support an inference that Vickers may have been relying on that withdrawn warrant for knowledge of the outstanding charges. The information included by Vickers on the IAD forms also does not match information contained in a "speedy trial" request form that defendant filled out in 1998 and mailed in 1999 that the parties agree did not comply with the IAD. The information included by Vickers on the IAD forms does, however, match the information contained in the indictment that was enclosed with the letter mailed to the Gig Harbor facility in 1998.

That the defense investigator testified that "the detainer was not in" documents sent to her by Vickers is of little significance. Whatever those documents were, they were not made part of this record. Thus, we have no way of knowing whether the investigator received from Vickers the 1998 letter described above, much less whether the investigator recognized it as a "detainer."

Finally, defendant's own testimony implies that a detainer had been lodged against her at the Gig Harbor facility. Defendant testified that she knew about the outstanding Oregon charges and that she had refused to waive extradition on the Governor's warrant, but that, until 2002, no Washington prison official had ever informed her of any detainer lodged after she had been transported to the Gig Harbor facility and the Governor's warrant had been dismissed. Defendant testified that, in June 1998, shortly after her arrival at the Gig Harbor facility, she consulted a non-lawyer at the prison library who gave her a "motion for speedy trial" form which she filled out, stating "there is a fugitive warrant from Multnomah County for me for the crimes of possession of a firearm and prostitution."[6] Almost four years later, in April 2002, defendant sought out Vickers. She testified as follows about her exchange with him:

"I asked him, 'Can you please check, I've had my counselor and everyone else check to see if there's any detainers and what I do.' And he was on the computer and he was like in awe and said, 'I'm going to get this paperwork sent again one more time for you,' and sent it a second time.

"Q: But it wasn't the same paperwork?

"A: No, it wasn't. But he—I told him I already sent it. He said he'd redo it for me, send it again and see what happens."

---

[6] Defendant mailed that form to the Multnomah County Circuit Court some 18 months after she filled it out. Defendant concedes that it did not constitute a request for final disposition of the present charges for purposes of the IAD, and does not argue that it has any relevance to the issues presented here. (We note that the charges at issue in the present case are, in fact, for possession of a firearm and possession of controlled substances rather than for possession of a firearm and prostitution.)

Thus, defendant's own testimony corroborates what the IAD paperwork suggests: When Vickers checked defendant's file, he discovered that Oregon had lodged a detainer against defendant, and he thereafter informed defendant of her IAD rights and completed the IAD forms after defendant had properly made a request for disposition of the Oregon charges by signing Form II.

In sum, all of the evidence supports a determination that Oregon lodged a detainer on the Multnomah County charges against defendant while she was incarcerated in the Gig Harbor facility. Nevertheless, in our prior opinion, we stated that Vickers's notation of "None known" on a line of Form III concerning "detainers currently on file against this inmate from your state" "arguably corroborates the view" that no detainer ever had been filed on the Multnomah County charges. *Ayers*, 203 Or App at 687. On reconsideration, we conclude that that statement was incorrect.

As explained above, the IAD provisions that authorized Vickers to fill out the forms described above come into play only after a detainer has been lodged. The state posits on reconsideration, and we agree, that the information required on Form III concerning "detainers currently on file against this inmate from your state" is provided for purposes of enforcement of the antishuttling provision of Article III(d), which provides that a request by an inmate pursuant to Article III(a) "shall operate as a request for final disposition of all untried indictments, informations or complaints on the basis of which detainers have been lodged against the prisoner from the state to whose prosecuting official the request for final disposition is specifically directed." The notation on the bottom of Form III that copies "should also be sent to all *other* prosecutors in the same state who have lodged detainers against the inmate" further supports that conclusion. That is, the only plausible way to read Vickers's "None known" notation on Form III is that it means Vickers knew of no Oregon detainers *other than* the one that he was currently processing pursuant to the provisions of Articles III and V of the IAD.

In light of our reexamination of the record, we conclude that we erred in determining that there were unresolved factual questions concerning "[w]hen, if ever, did

Multnomah County authorities lodge a detainer against defendant at the Gig Harbor facility?" 203 Or App at 703. The evidence supports only one determination: Multnomah County did lodge a detainer against defendant at the Gig Harbor facility—and it did so in 1998.

Although the state has not specifically raised this question in its petition for reconsideration, we also reexamine, and disavow, our prior conclusion that there is a "disputed factual" issue as to "when, if ever, * * * did defendant, who was unrepresented, have a sufficient awareness of the detainer and of her entitlement under the IAD to request a final disposition of the Oregon charges?" *Id.* Defendant testified that she first became aware of the existence of the detainer and of her entitlement under the IAD to request a final disposition of the Oregon charges when she inquired about the existence of a detainer in April 2002. IAD Form I, filled out by Vickers at that time, corroborates that account. There is no evidence in the record that defendant had actual knowledge of the existence of the detainer before that point, much less that defendant had knowledge of how to utilize the IAD to request final disposition of the Oregon charges.[7]

■　In sum, we conclude that, contrary to our original conclusion, no factual issues requiring a remand remain to be resolved. The evidence establishes that Oregon lodged a detainer against defendant at the Gig Harbor facility on the Multnomah County charges in 1998. The evidence further establishes that Washington prison officials failed to carry out their duties pursuant to Article III(c) of the IAD to "*promptly* inform the prisoner of the source and contents of any detainer lodged against the prisoner and * * * also inform the prisoner of the right to make a request for final disposition[.]" (Emphasis added.) Rather, the Washington prison official, Vickers, carried out that duty in April 2002, some four years after the detainer had been lodged. Further, before April 2002, defendant did not know how to invoke her rights under the IAD, as evidenced by her ineffective attempt

---

[7] In fact, there is convincing evidence that defendant did *not* know how to request final disposition of the Oregon charges, given her ineffective attempt to do so in 1999. *See* 207 Or App at 680 n 6.

to do so. *See* 207 Or App at 680 n 6. Thus, with no factual issues left to be resolved, the question is whether, on these facts, defendant waived her entitlement to a speedy trial under ORS 135.747.

Under the reasoning in our prior opinion, the answer to that question is "no." While the factual mistakes described above necessarily call into question our prior *disposition*— that is, our conclusion that we needed to remand the case for additional factual findings—they do not affect the validity of our waiver analysis. We held:

> "[I]f an inmate incarcerated outside of Oregon is repre-
> sented by counsel, or is unrepresented but knowingly fails
> to demand trial pursuant to Article III(a) of the IAD on
> pending Oregon charges, that inmate will be deemed to
> have 'waived' the protections of ORS 135.747."

*Ayers*, 203 Or App at 700. If that is the test, no evidence in the record supports a conclusion that defendant waived the protections of ORS 135.747.

The state argues, however, that our analysis contained substantial flaws. In particular, the state argues that (1) the IAD and ORS 135.747 are in conflict and that the IAD, as the more specific statute, controls the analysis; (2) we erred in failing to conclude that all delay that follows after a defendant absconds from Oregon and commits new crimes in another jurisdiction is necessarily delay attributable to the defendant; (3) our prior opinion incorrectly held that delay caused by the negligence of Washington prison officials could be attributed to the State of Oregon; (4) we erroneously assigned to the state the burden of demonstrating whether a defendant has waived statutory speedy trial rights; and (5) our conclusion that whether defendant was represented by counsel on the Oregon charges was relevant to the waiver inquiry is problematic.

We decline to revisit our conclusion that ORS 135.747 applies to defendants who are incarcerated in other jurisdictions despite the existence of the IAD. We considered, and rejected, the state's arguments that the IAD and ORS

135.747 were irreconcilable. *Ayers*, 203 Or App at 693-700. We adhere to our prior opinion in that respect.

Before turning to the specifics of the state's remaining arguments, we recapitulate the conclusions that we reached concerning ORS 135.747 and its application to defendants serving sentences in other jurisdictions. First, we noted that, although we had not addressed the precise issue presented here with respect to the IAD's effect on speedy trial rights under ORS 135.747, numerous cases had considered the interplay between ORS 135.747 and ORS 135.760, which we described as the "intrastate" analog to the IAD.[8] *Ayers*, 203 Or App at 695-96. In particular, we noted the existence of a line of cases that held that "an inmate defendant's failure to make a speedy trial request under ORS 135.760 (or its antecedent), effectively 'waived' the defendant's protections under ORS 135.747 (or its antecedent)." *Id.* at 696 (citing *State v. Vawter*, 236 Or 85, 386 P2d 915 (1963)); *Bevel v. Gladden*, 232 Or 578, 376 P2d 117 (1962). We further observed that, in *State v. Downing*, 4 Or App 269, 478 P2d 420 (1970), we added a pertinent modification to that formulation in situations in which an inmate is not represented by counsel: "[A]n unrepresented inmate-defendant must knowingly fail to invoke the 90-day trial demand provision of ORS 135.760 to be deemed to have 'waived' the protections of ORS 135.747." *Ayers*, 203 Or App at 700 (citing *Downing*, 4 Or App at 273-74).[9] We concluded that the same principles enunciated in that line of cases should apply with equal force when a defendant is incarcerated in another jurisdiction and the IAD provides the mechanism by which that defendant may be brought to trial on Oregon charges. *Ayers*, 203 Or App at 700. We concluded, "[I]f an inmate incarcerated outside of Oregon is represented by counsel, or is unrepresented but knowingly fails to demand trial pursuant to Article III(a) of the IAD on pending Oregon charges, that inmate will be

[8] ORS 135.760 provides the means by which inmates incarcerated in Oregon may request disposition of other charges pending in Oregon.

[9] We further noted that "waiver," as used in the context of those cases, would preclude the defendant from complaining about any period of delay *after* he or she knowingly failed to exercise rights available under the IAD, but would not constitute a waiver as to earlier periods of delay. *Ayers*, 203 Or App at 701.

deemed to have 'waived' the protections of ORS 135.747." *Id.* (footnote omitted).

We turn to the state's assertion that our opinion undermines prior case law that establishes that delay that follows a defendant absconding and committing new crimes should not be attributed to the state for purposes of ORS 137.747. To the extent that the state is relying on cases in which a defendant absconds and is at large—a situation in which the state has no knowledge of the defendant's where-abouts—we find those cases to be inapposite.[10] Here, the delay in question occurred at a time when defendant was not at large. She was imprisoned in Washington, and the State of Oregon knew of her whereabouts. Moreover, *because* defendant was imprisoned in Washington, she was not in a posi-tion to simply decide to come back and face the Oregon charges as a defendant at large might choose to do. Thus, we limit our consideration to cases in which charges were pend-ing in Oregon while the defendant was imprisoned in another state.

The primary case of that sort on which the state relies is *State v. Storms*, 244 Or 357, 418 P2d 261 (1966). In *Storms*, the court stated:

> "While it is true that some four years elapsed between the date of indictment and the date of trial, the delay was of the defendant's own making. After he was indicted in Oregon, but before he could be tried, he was tried, convicted and imprisoned in Idaho. He was promptly tried in Oregon after he had served his sentence in Idaho. We are unaware of any rule that requires us to confer immunity upon a person for his crimes in Oregon when his criminal activities in other states serve to prevent a speedy trial in this state."

*Id.* at 358 (citations omitted). *Storms*, however, needs to be viewed in light of subsequent developments. In *State v. Jordon*, 248 Or 555, 556, 436 P2d 1 (1968), the defendant was indicted in Oregon, but was subsequently convicted and imprisoned in Washington for a different crime, and it was

---

[10] To the extent that the state is suggesting that a defendant absconding or committing new crimes necessarily defeats his or her statutory speedy trial rights, *State v. Davids*, 339 Or 96, 116 P3d 894 (2005), and *State v. Johnson*, 339 Or 69, 116 P3d 879 (2005), clearly indicate otherwise.

not until he finished the Washington sentence that the Oregon charges were tried. In concluding that *Storms* was controlling, the court observed:

> "Defendant cites no reciprocal agreement and we know of none between the state of Washington and Oregon whereby either state can or will consent to a prison inmate being temporarily released to the other jurisdiction for the purpose of standing trial for an alleged criminal offense."

*Id.* at 557.

The year following that decision, however, such a reciprocal agreement *was* in place: In 1969, the legislature enacted the IAD. Or Laws 1969, ch 362.[11] Thus, in *Storms* and in *Jordon*, the defendant's incarceration in another state "serve[d] to *prevent* a speedy trial in this state." *Storms*, 244 Or at 358 (emphasis added). After the enactment of the IAD, that impediment to trying a defendant on Oregon charges was removed. Under Article IV of the IAD, a state that has pending charges against a defendant incarcerated in another state "shall be entitled to have a prisoner against whom the officer has lodged a detainer and who is serving a term of imprisonment in any party state made available in accordance with paragraph (a) of Article V[.]" In sum, *Storms* and *Jordon* were decided in an era when the state had no legal mechanism by which it could bring to trial a defendant who was serving a sentence in another state. Because that is no longer the case, those cases are not dispositive in the present circumstances.

The state further argues that our analysis in *Ayers* is at odds with our decision in *Coffman*. In *Coffman*, a defendant serving a sentence in California attempted to invoke Article III of the IAD to obtain resolution of a charge pending in Oregon. His attempt was ineffective, however, because no detainer had been lodged as to that charge:

> "Because no detainer against defendant was ever filed, the interstate agreement did not become operative, and the state was not bound by its provisions. We acknowledge that being able to cause prisoners to be held without filing detainers may allow prosecuting officials to frustrate the

---

[11] Washington had enacted the IAD in 1967. Wa Laws 1967, ch 34, § 1.

purposes of the agreement by waiting until a prisoner is about to be released from the other state's custody before filing a detainer. A prisoner's *only* remedy in such a situation is to move for dismissal of the charges on *constitutional* grounds for lack of speedy trial."

*Coffman*, 59 Or App at 22-23 (footnotes omitted; emphasis added).

The state suggests that *Coffman* stands for the proposition that a defendant imprisoned in another jurisdiction may have *constitutional* speedy trial rights, but has no statutory speedy trial rights under ORS 135.747. While the final sentence of the quotation above, viewed in isolation, could certainly be so understood, the context reveals that that was not what was meant by that statement. In *Coffman*, the defendant sought remedies pursuant to the IAD and pursuant to the speedy trial guarantees of the state and federal constitutions. No mention was made of any statutory speedy trial right other than the one afforded by the IAD itself.[12] We thus read the language in *Coffman* about the "only remedy" to refer to the universe of remedies *that the defendant was seeking in that case.* We do not read that case as foreclosing the possibility of a remedy under a statute that was not at issue and not discussed. To the extent that that statement in *Coffman* can be read to suggest that a defendant incarcerated in another jurisdiction has no statutory speedy trial rights, we reject that reading of it. We adhere to our conclusion that ORS 135.747 applies to defendants incarcerated in other jurisdictions.

We turn next to the state's argument that our analysis unfairly holds the state responsible for the negligence of Washington officials in failing to inform defendant of her right to seek disposition of the Oregon charges pursuant to the IAD and unfairly places a burden on the state to demonstrate that a defendant has waived rights under ORS 135.747.

---

[12] In fact, as defendant points out, there would have been no viable speedy trial claim under ORS 135.747 under the facts at issue in *Coffman*, because the delay at issue occurred after the dismissal of the original accusatory instrument and before a new one was filed. *Coffman*, 59 Or App at 20-21.

■      The state correctly notes that, under the IAD, negligence by officials in processing IAD requests does not provide a basis for dismissal of charges. *See, e.g., State v. Estes*, 131 Or App 188, 883 P2d 1335 (1994), *rev den*, 320 Or 569 (1995). The state argues that that principle should apply with equal force to ORS 135.747, particularly in light of the fact that prison officials in other states have no general obligation to comply with Oregon statutes.

We disagree. That one statutory scheme does not provide a remedy under a particular set of circumstances does not compel the conclusion that a different statutory scheme cannot, or should not, provide a remedy. In *Estes*, we held that the IAD did not provide a remedy for violations of the IAD notification requirements, and we would not "insert a remedy of dismissal where none is provided." 131 Or App at 191. That is, the IAD specifies a remedy of dismissal for violation of certain of its provisions; we declined an invitation to extend those remedies to violations of other IAD provisions. Conversely, ORS 135.747, by its own terms, *does* apply to the present situation, and specifies a remedy of dismissal if a defendant is not brought to trial within a reasonable time.

Under an ORS 135.747 analysis, delay in bringing a defendant to trial must be attributed either to the state or to the defendant. *See, e.g., State v. Brunoe*, 204 Or App 749, 752-53, 131 P3d 743 (2006). That is, ORS 135.747 requires the *state* to bring a defendant to trial within a "reasonable period of time," unless the trial has been "postponed upon the application of the defendant or by the consent of the defendant[.]" Although the state insists that it should not be held accountable for failing to bring a defendant to trial when the defendant is incarcerated in another state, it fails to explain how such a delay can be attributed to the defendant rather than the state in a situation such as this one, where defendant was not advised of her rights under Article III of the IAD or provided the necessary paperwork by the Washington prison officials to initiate disposition of the charges pursuant to Article III.

When a defendant is incarcerated in another state and Oregon has lodged a detainer, Oregon has the ability to bring the defendant back for trial pursuant to Article IV of

the IAD.[13] The defendant, on the other hand, does not have the ability to come back for trial unless two things occur: After being made aware of the existence of a detainer, she requests final disposition of the charges on which the detainer is based, Article III(c), and officials in the facility in which the defendant is incarcerated carry out their statutory duties pursuant to Articles III and V to complete the paperwork necessary to effectuate the defendant's request.

■■   To the extent that we held in our previous opinion that the "burden" was on the state to demonstrate that defendant had waived her rights under ORS 135.747, we adhere to that conclusion. ORS 135.747 does, in fact, place a burden on the state to bring a defendant to trial within a reasonable period of time, with certain exceptions, *i.e.*, the defendant has caused or consented to the delay, or waived her rights under ORS 135.747. Delay will not be attributed to a defendant if the delay "was beyond defendant's control." *State v. Davids*, 339 Or 96, 101, 116 P3d 894 (2005). When a delay occurs because a defendant is incarcerated in another state and has not been provided with the information and means necessary to invoke her rights under the IAD to be brought to trial, that delay is beyond the defendant's control. That conclusion is not altered simply because it was another jurisdiction's prison officials rather than the State of Oregon that failed to provide defendant with the information and means necessary to invoke her rights under the IAD. We thus adhere to our basic conclusions that (a) the state has the functional burden of demonstrating that a defendant has waived rights under ORS 135.747 or consented to a delay; and (b) that the

---

[13] We acknowledge, at this point, the very informative *amicus curiae* brief of the Oregon District Attorneys Association (ODAA). ODAA points out that, in fact, prosecutors' ability to utilize Article IV is extremely circumscribed because the Governor has established a policy, based on budgetary constraints, of authorizing the transport of only those charged with the most serious felonies. ODAA asserts that, in light of that policy, many prosecutors elect not to file detainers in cases involving other types of charges because "placing a detainer on a defendant who will be refused transport by the Governor is tantamount to dismissing the case with prejudice, should that defendant demand resolution of his Oregon charges." We fully understand that the use of Article IV may well be out of the hands of the prosecutors who seek to try individuals incarcerated in other states. Nonetheless, as the court made clear in *State v. Adams*, 339 Or 104, 111, 116 P3d 898 (2005), discussed below, 207 Or App at 692, a problem with lack of governmental resources, even those not within the control of the prosecutor, "can only go so far in expanding the period of time that will be considered 'reasonable' for purposes of ORS 135.747."

negligence of prison officials in other jurisdictions (such as failure to inform inmates of their rights under the IAD or failure to process inmates' requests for disposition of charges pursuant to the IAD) simply has no bearing on whether or not a defendant consented to a delay or waived statutory speedy trial rights.

That leads us to the state's final point raised on reconsideration. The state argues that whether a defendant incarcerated in another state "was represented by counsel on the Oregon charges after the detainer was lodged[,]" *Ayers*, 203 Or App at 703, should not play a part in the analysis. The state points out that, unlike situations in which a defendant opposes extradition or seeks to contest a state's invocation of Article IV of the IAD, under which the defendant has a right to counsel either under the IAD or the Uniform Criminal Extradition Act, *see* ORS 133.787; Rev Code Wash 10.88.290, there is no statutory mechanism for appointing counsel to assist an inmate in invoking rights under Article III of the IAD. The state argues that the role of an attorney on the Oregon charges is unclear, at best, under these circumstances.

■　On reflection, we agree. In light of our clearer understanding of how the IAD provisions function together, as described above, we conclude that the test that we adopted from *Vawter*, *Bevel*, and *Downing* should be revised somewhat in situations in which a defendant against whom a detainer has been lodged is incarcerated in a jurisdiction that is a signatory to the IAD. The IAD does not place responsibility on defense counsel to inform an inmate of the existence of the detainer and his or her rights under Article III. Rather, the IAD places that responsibility squarely on the officials in the jurisdiction in which the defendant is incarcerated. Moreover, a defendant who has invoked Article III of the IAD should not need an attorney to ensure that his or her request is processed; the IAD requires prison officials to honor the request and take the steps necessary to carry it out. Accordingly, we disavow the test set forth in our prior opinion,[14] and

---

[14] "[T]o establish a 'waiver,' the state must show either that the inmate-defendant was represented by counsel on the Oregon charges after the detainer was lodged or, if unrepresented, knew of the detainer and his or her rights under the IAD and knowingly failed to invoke Article III of the IAD." *Ayers*, 203 Or App at 703.

hereby adopt the following modified test: *To establish that a defendant incarcerated in another jurisdiction against whom a detainer has been lodged has waived his or her rights to a speedy trial under ORS 135.747, the state must show that the defendant was apprised of his or her rights under the IAD and knowingly failed to invoke Article III of the IAD.*

■   We return, then, to the facts of this case, and examine them in light of that test. Defendant was indicted on February 15, 1996, and was ultimately tried in October 2002, approximately six and one-half years later. Defendant absconded from supervision in March 1996, and the State of Oregon had no knowledge of her whereabouts until March 1998, when defendant was charged with crimes in Washington. Defendant opposed extradition to Oregon, and the extradition proceeding was dismissed on June 18, 1998. We therefore attribute the delay from March 1996 through June 18, 1998, to defendant. Several days later, the State of Oregon lodged a detainer on those charges at the institution in which defendant was incarcerated. The prison officials at that institution, however, failed to carry out their duties pursuant to Article III of the IAD to "promptly" inform defendant of that detainer and advise her of her right to request disposition of the charges. Rather, defendant was informed of the detainer and apprised of her rights under Article III of the IAD on April 18, 2002. Under those circumstances, the delay between June 18, 1998 and April 18, 2002, was a delay that was beyond defendant's control, and she cannot be said to have consented to it. Moreover, from the time the detainer was lodged until April 18, 2002, the State of Oregon had the ability (although perhaps not the resources) to utilize Article IV of the IAD to bring defendant to trial. Thus, the delay between June 18, 1998 and April 18, 2002, of three years and ten months, must be attributed to the state. Defendant was ultimately brought to trial approximately five and one-half months after she successfully invoked her rights under Article III of the IAD.[15]

■   Thus, defendant caused or consented to approximately two years and three months of the six and one-half

---

[15] It is not disputed that that final five and one-half months is attributable to the state.

year delay in bringing her to trial. The remaining four and one-quarter or so years is attributable to the state. The question, then, is whether that delay was reasonable. "[T]he circumstances that caused the delay generally determine whether the delay is reasonable." *Davids*, 339 Or at 101 (citing *State v. Johnson*, 339 Or 69, 88, 116 P3d 879 (2005)). If a delay results from "simple neglect" on the state's part, very little delay will be considered reasonable. *Davids*, 339 Or at 101. Lack of resources to bring a defendant to trial—even if brought about by "reasonable" legislative policy choices—does not, in itself, necessarily justify delay. *Adams*, 339 Or at 111. The court emphasized that whether a policy choice is reasonable is "entirely separate from the question of whether a time period required to bring a defendant to trial is 'reasonable' for purposes of ORS 135.747." *Id.* Thus, while we appreciate *amicus curiae* ODAA's input concerning the state's budgetary constraints when it comes to bringing out-of-state defendants to trial in Oregon, our focus cannot be on the reasonableness of that policy, but must be on the reasonableness of the delay under the circumstances of this case.

Here, virtually *all* of the delay attributed to the state occurred after the state lodged a detainer against defendant at the Gig Harbor facility. This is not a "simple neglect" case, in which the state took no steps to bring defendant to trial. Rather, as described above, the State of Oregon first sought to extradite defendant and defendant resisted the state's efforts. Thereafter, the state took steps to ensure that a detainer was lodged against defendant at the prison in which she ultimately was incarcerated.

At this point, we return briefly to the provisions of the IAD. The state, having lodged the detainer against defendant, was entitled to assume that Washington, as a signatory to the IAD, had carried out its statutorily mandated duties to inform defendant of the detainer and to provide her with the information mandated by Article III(c) as to how to bring about prompt resolution of the charges should she so desire. *See* 207 Or App at 674-75 (describing obligation under IAD Article III(c)); *cf.* OEC 311(1)(j) (evidentiary presumption that "[o]fficial duty has been regularly performed"); OEC 311(1)(x) (evidentiary presumption that "[t]he law has been obeyed"). Although that turned out not to be the case—

Washington authorities did not perform their statutorily mandated duties—we conclude that it was nonetheless reasonable, under these circumstances, for the state to have assumed that defendant had been informed of her right to have the charges against her disposed of promptly, and for the state to have assumed that defendant had waived that right by not invoking Article III of the IAD.

In sum, in this case, the state *did* undertake reasonable efforts toward resolution of the charges. Although it is true that the state was not precluded from doing more (that is, invoking Article IV of the IAD to have defendant returned for trial regardless of whether she desired a speedy trial), that does not undermine our conclusion that the state, under these circumstances, was entitled to assume that defendant, who had previously resisted return to Oregon for resolution of these charges and who had not invoked her Article III right to have the charges resolved quickly, had waived her right to a speedy trial on the charges.

In *Adams*, the court observed that, "[a]lthough it is difficult to identify the point at which delay becomes unacceptable, we think that a delay that roughly equals the statute of limitations for the crime at issue is too long." 339 Or at 112. Here, a delay of more than four years is longer than the three-year statute of limitations for the charged offenses. *See* ORS 131.125(6). Nonetheless, we conclude that the extraordinary circumstances of this case warrant a departure from that general precept. Here, the delay occurred because IAD procedures were not properly followed, but that problem was not brought about by any action or inaction of the State of Oregon—and was, in fact, beyond the control of the State of Oregon. In the totality of the circumstances, we conclude that, for purposes of ORS 135.747, the State of Oregon's delay in bringing defendant to trial ultimately was a reasonable delay.

Reconsideration allowed; former opinion and disposition modified; affirmed.