Argued and submitted November 8, decision of Court of Appeals affirmed in part and reversed in part; judgment of circuit court reversed, and case remanded to circuit court for further proceedings December 30, 2010, respondent on review's petition for reconsideration allowed by opinion February 19, 2011 See 349 Or 604, 247 P3d 759 (2011)

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## JOAQUIN SIERRA,
*Petitioner on Review.*

(TC 05C40355; CA A136120; SC S057794)

254 P3d 149

David Ferry, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief was Peter Gartlan, Chief Defender.

Michael A. Casper, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

DURHAM, J.

DURHAM, J.

This is a criminal case in which defendant challenges the sufficiency of the evidence to support his two convictions for the offense of kidnapping in the second degree, ORS 163.225, and his single conviction for the offense of kidnapping in the first degree, ORS 163.235.[1] The Court of Appeals affirmed defendant's convictions. *State v. Sierra*, 228 Or App 149, 206 P3d 1153 (2009). We allowed defendant's petition for review and now affirm his conviction for first-degree kidnapping but reverse his two convictions for second-degree kidnapping.

Because defendant challenges the trial court's denial of his motion for judgment of acquittal, we state the facts underlying defendant's conviction in the light most favorable to the state. *See State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994) (stating that rule).[2] On the evening of January 14, 2005, defendant stopped at a truck stop to rest. The truck stop included a fast-food restaurant and an adjoining convenience store. The convenience store had front and rear entrances. A "diesel desk" with a cash register (for transactions involving diesel fuel) was located at the rear of the store, and behind the diesel desk was a door to the manager's office. Ordinarily, a cashier would stand behind the diesel desk to accept payments from customers; in doing so, the cashier would face the store's front entrance. The dimensions of the area behind the diesel desk were seven and one-half feet by eight feet. In order to access that area from the store's rear entrance, a person ordinarily would walk around the front of the diesel desk and up a short ramp to a raised platform behind the diesel desk.

Derrick, an employee at the convenience store, received a complaint from a customer that a man had an open

---

[1] The 2003 version of ORS 163.225 and ORS 163.235 was in effect at the time that defendant committed his offenses. Since 2003, the legislature has amended other portions of ORS 163.225 and ORS 163.235. Those amendments are not relevant to the disposition of this case.

[2] Our "record on review * * * consist[s] of the record before the Court of Appeals." ORAP 9.20(5). In this case, that record does not contain the exhibits submitted by the parties at trial.

container of alcohol in the men's restroom and had been making inappropriate sexual comments. Derrick reported the complaint to the shift manager, who directed Derrick to take care of the problem. Derrick entered the men's restroom and saw defendant, who was rinsing his face, as well as an open bottle of beer nearby. Derrick informed defendant that alcohol was not allowed in the restroom, described the complaint that he had received, and told defendant that he should leave. Defendant became angry and confrontational, but Derrick was able to back him out of the restroom without a physical altercation. At that point, defendant left the store area through the rear entrance. Derrick, the shift manager, and another employee remained outside the rear entrance.

Defendant returned to his truck, where he thought about the confrontation. After a few minutes, he decided to return to the store in order to scare Derrick and secure an apology. He grabbed a loaded crossbow and extra bolts (*i.e.*, ammunition for the crossbow) from his truck, and walked back to the store. When the shift manager and the other employee saw defendant approach with the crossbow, they ran into the store and locked themselves inside the manager's office. Derrick remained outside. Defendant grabbed Derrick's arm, pointed the crossbow at Derrick's head, and took him inside the convenience store.

Defendant directed Derrick through the rear entrance, around the front of the diesel desk, up the ramp, and made Derrick kneel in the middle of the area behind the diesel desk. Defendant stood in that area, a little to the front of Derrick, in a position that would permit him to monitor the front and rear entrances. Defendant yelled insults at Derrick. He told Derrick that the accusations—*i.e.*, Derrick's relation of the customer's complaint—had hurt him. He threatened to hurt Derrick and his children, and asked Derrick how he would feel if defendant hurt Derrick's daughter in the same way that Derrick had hurt him. At some point, he kicked Derrick in the face, causing a bloody nose.

Jeter and Mintun, two off-duty employees of a youth correctional facility, had stopped at the truck stop to eat at the adjoining restaurant. They heard a commotion and went into the convenience store to see if they could assist. Jeter

testified that he had encountered defendant in the men's restroom earlier in the evening and that defendant had been "pretty good" with him, but that, when Jeter entered the convenience store, defendant was "upset" and "out of control." Mintun attempted to divert defendant's attention so that Jeter would be able to restrain him. Defendant yelled at Jeter and Mintun to leave. When they refused, defendant pointed the crossbow at them. He directed them to come around the front of the diesel desk and up the ramp to the area behind the diesel desk, and then ordered them to kneel next to Derrick. He then paced back and forth while yelling and pointing his crossbow at all three individuals.

Three sheriff's deputies and an Oregon State Police sergeant arrived at the scene. After some of the officers peeked through the store's windows and saw defendant behind the diesel desk pointing the crossbow at the victims, the officers decided to enter the store to end the situation. When the officers entered, announced their presence, and ordered defendant to drop his weapon, defendant turned towards them and pointed the crossbow in their direction. One of the officers shot defendant.

An 11-count indictment charged defendant with seven counts of unlawful use of a weapon, one count of fourth-degree assault (of Derrick), one count of first-degree kidnapping (of Derrick), and two counts of second-degree kidnapping (of Jeter and Mintun). Each of the kidnapping counts alleged that defendant "did unlawfully and knowingly, without consent or legal authority, take [the victim] from one place to another, with intent to interfere substantially with the [victim's] personal liberty." The first-degree kidnapping charge, which pertained to Derrick, alleged, in addition, that defendant acted "with the purpose of terrorizing * * * Derrick."

The case proceeded to a jury trial. At the close of the state's case, defendant moved for a judgment of acquittal on the kidnapping charges. As to the first-degree kidnapping charge, defendant argued that the evidence was insufficient to show that he had acted with the purpose of "terrorizing" Derrick. As to the second-degree kidnapping charges, defendant argued that the state had not introduced sufficient

evidence to prove that he had moved Jeter and Mintun "from one place to another" or that he had intended to "interfere substantially with [their] liberty." The trial court denied the motions for judgment of acquittal, and the jury convicted defendant of all three kidnapping charges.[3] On defendant's appeal, the Court of Appeals affirmed in a written opinion. *State v. Sierra*, 228 Or App 149, 206 P3d 1153 (2009). Defendant then petitioned for review, challenging the sufficiency of the evidence as to each of his three kidnapping convictions.

██  We begin by addressing the parties' arguments concerning defendant's second-degree kidnapping convictions for his actions taken against Jeter and Mintun. ORS 163.225(1), which defines the offense of kidnapping in the second degree, provides:

"(1)  A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, the person:

"(a)  Takes the person from one place to another; or

"(b)  Secretly confines the person in a place where the person is not likely to be found."

ORS 163.225(1)(a) and (b) thus provide alternative ways for the state to prove the act element of kidnapping. As noted above, in this case, by alleging in the indictment that defendant did "take [the victims] from one place to another," the state elected to proceed on the asportation theory under ORS 163.225(1)(a). Thus, to establish kidnapping here, the state had to prove that defendant (1) "without consent or legal authority," (2) took the victims "from one place to another," (3) "with intent to interfere substantially" with the victims' "personal liberty." On review, defendant renews his argument that the state presented insufficient evidence as to the latter two elements. We first consider whether, viewed in the light most favorable to the state, the evidence was sufficient

---

[3] The jury also convicted defendant of assault in the fourth degree and five counts of unlawful use of a weapon. The jury acquitted defendant of one unlawful use of a weapon charge. The state had dismissed another one of the unlawful use of a weapon charges prior to trial.

to prove the act element of kidnapping, namely, that defendant took Jeter and Mintun "from one place to another."

■    The state and defendant offer competing understandings as to the meaning of the act element of kidnapping by asportation. Defendant proposes that that element is satisfied when a defendant takes the victim *either* a substantial distance or to a qualitatively different place. Defendant submits that, as a general rule, movement within a single structure (such as a home, building, or car), including room-to-room movement, will not be movement to a qualitatively different place in terms of interference with a victim's liberty. The state appears to share defendant's view that the beginning place and ending place must be qualitatively different, but argues that place-to-place movement requires only proof that "the defendant moved the victim to a place that served to limit the victim's freedom of movement and increased the victim's isolation." The parties both acknowledge, as they must, that, in order to prove that defendant took a victim "from one place to another," the state is not required to prove that defendant took the victim a substantial distance. *See State v. Walch*, 346 Or 463, 473, 213 P3d 1201 (2009) (holding that legislature did not intend to incorporate a "substantial distance" requirement into ORS 163.225(1)(a) when it used the phrase "from one place to another").

Our inquiry does not begin with a clean slate. This court has considered the meaning of the phrase "from one place to another" twice before, in *State v. Murray*, 340 Or 599, 136 P3d 10 (2006) and *Walch*, 346 Or 463. Those decisions provide guidance here. In *Murray*, the court explained that the meaning of the phrase "from one place to another" reduces to an inquiry into the meaning of the word "place:"

> "The question of what is included in the concept of 'taking' a person 'from one place to another' is, at bottom, an exercise in metaphysics. The words 'from' and 'to' create no problem here, because they clearly describe the idea of movement, *i.e.*, of a change of position. And 'another' simply replicates 'place'—*i.e.*, the statutory phrase fairly may be paraphrased as a matter of standard English to require that a person be moved 'from place to place.' Thus, in the final analysis, this case comes down to the question of how

one is to define the term 'place' for the purposes of ORS 163.225(1)(a)."

340 Or at 603.

■ Admittedly, pinpointing the legislature's intended meaning of the word "place" with precision has proved somewhat vexing. The criminal code does not define the term, and the dictionary definition provides little assistance. *Id.* at 603-04 (explaining that the most relevant dictionary definition of "place"—"an indefinite region or expanse"—does little to clarify the meaning of the term as used in the kidnapping statutes); *see also Walch*, 346 Or at 470-73 (considering legislative history). However, in *Murray*, 340 Or at 606, the court explained that, as used in the kidnapping statutes,

> "the 'place' in which something or someone may be found and from which that something or someone may be taken is situational and contextual. It is, among other things, a function of the object to be moved, as well as a function of the area in which the movement occurs."

In *Walch*, the court further clarified the significance of the legislature's choice to use the word "place" within the phrase "from one place to another:"

> "[T]he legislature intended the asportation element to aid in narrowing the definition of kidnapping * * *. ORS 163.225(1)(a) requires that the defendant move the victim 'from one place to another'—not, for instance, that the defendant simply 'move' the victim or move the victim 'any distance.' The legislature intended the word 'place' to have some meaning; that is, a kidnapping does not occur by moving the victim *any* distance with intent to interfere substantially with his or her personal liberty. Rather, the movement must be such that it can be said that the victim was moved from 'one place' to 'another [place].'"

*Walch*, 346 Or at 473-74. Thus, under *Murray* and *Walch*, a defendant can be said to have moved the victim from "one place" to "another" only when the defendant changes the position of the victim such that, as a matter of situation and context, the victim's ending place is qualitatively different from the victim's starting place.

■ Moreover, *Murray* and *Walch* identify an additional requirement contained within the act element: the taking

must not be "only 'incidental' " to another crime. *Murray*, 340 Or at 606 ("incidental" asportation is "not the kind of conduct that the legislature intended to permit to serve as the basis for a separate kidnapping charge"); *Walch*, 346 Or at 478 ("kidnapping requires a 'tak[ing]' of the victim 'from one place to another' that is not ' "only incidental" ' to another crime."). This court's previous decisions have recognized that the legislature sought to prevent prosecutors from charging kidnapping when a defendant's movement of a victim was only incidental to another crime. *See State v. Mejia*, 348 Or 1, 7-8, 227 P3d 1139 (2010) (to that effect); *Walch*, 346 Or at 473 (same). The primary means by which the legislature accomplished that goal was through the narrowly crafted intent element that requires the state to prove that the defendant intended to interfere substantially with the victim's liberty. *Id.* However, the legislature *also* crafted the asportation act element of ORS 163.225(1)(a) with that same overarching goal in mind. *See id.* ("[T]he wording of the [kidnapping] statute indicates that the legislature intended the asportation element to aid in narrowing the definition of kidnapping[.]").

The rules outlined above explain the divergent outcomes in *Murray* and *Walch*. In *Murray*, the victim was in the driver's seat of her car when the defendant approached, instructed her to "[g]et over" and forcibly pushed her from the driver's seat to the passenger's seat. 340 Or at 601. From there, the victim escaped by exiting through the passenger side door; defendant then drove the car away. *Id.* at 602. The court held that defendant's movement of the victim was insufficient to satisfy the act element of kidnapping by asportation because, even assuming that the movement of the victim from driver's seat to passenger's seat was place-to-place movement, that movement was incidental to defendant's substantive crime:

> "[E]ven if one were to find some sort of asportation in the events in question, it was only 'incidental' * * * to defendant's theft of the car and, therefore, not the kind of conduct that the legislature intended to permit to serve as the basis for a separate kidnapping charge."

*Id.* at 606; *see also Walch*, 346 Or at 479 (explaining that, in *Murray*, "[t]he defendant's physical contact with the victim was 'only incidental' to the other crimes that he committed").

In contrast, *Walch* involved nonincidental movement "from one place to another." The defendant in *Walch* attacked the victim when she was standing in her driveway, walking back toward an adjacent house. 346 Or at 466. He began to strangle her and told her that he wanted her money. *Id.* After the victim told defendant that her money was in the house, defendant continued to drag the victim toward a car, picked her up, and shoved her into the trunk of the car. After the victim resisted, defendant eventually let her return to the house. *Id.* On those facts, the court held that the defendant had taken the victim "from one place to another:"

> "Defendant * * * picked the victim up and shoved her into a car, a location (and an object) intended to quickly move people a distance of some miles. * * * Because the context is such that defendant moved the victim from one place (the open driveway) to a qualitatively different, more mobile and isolated place (the trunk of a car), we conclude that the asportation element of the kidnapping statute has been satisfied."

*Id.* at 476.[4] The court then concluded that defendant's movement of the victim was not incidental to the other crimes: After assaulting and robbing the victim, defendant "*also* moved the victim about 15 feet to the car, lifted her off the ground, placed her in the trunk, and tried to shut the trunk lid." *Id.* at 479 (emphasis in original). In our view, *Murray* and *Walch* are consistent: The former involved only incidental movement of the victim, while the latter involved nonincidental movement of the victim between two qualitatively different places.[5]

---

[4] Although the ultimate determination of whether a victim has been taken from "one place to another" is situational and contextual, we note that one aspect of a vehicle that distinguishes it from a number of other locations is its mobile nature. *See Walch*, 346 Or at 476 (describing a car as "a location (and an object) intended to quickly move people a distance of some miles"). The mobile nature of a vehicle was an important aspect of our holding in *Walch* that the movement there was from "one place to another."

[5] We emphasize that our review of the facts in *Murray*, *Walch*, and other related cases is not intended to announce specific factual criteria that necessarily

We pause before turning to the facts of this case in order to dispel any misconceptions that may persist as to the meaning the phrase "from one place to another" as it is used in the kidnapping statutes. First, because the wording selected by the legislature requires movement from one place to a second, distinct place, it generally is problematic to suggest or conclude that minimal movement that effectuates little change in the victim's position—such as, for example, movement requiring one to step to the side, or move from a standing position to a sitting or lying position—is movement "from one place to another." Second, because the asportation element is defined in terms of relative movement, the degree of force or threat used by a defendant to effectuate the victim's movement ordinarily is not relevant to a determination whether a victim has been "taken from one place to another." Third, the degree by which the movement in question increases defendant's control over the victim, or isolates the victim from the view of others, is relevant to the determination whether a defendant has moved a victim "from one place to another" only to the extent that those considerations tend to demonstrate the qualitative difference between where the victim started ("from one place") and where the victim was as a result of the defendant's conduct ("another [place]"). *See Walch*, 346 Or at 482 (When defendant forced victim from a driveway outside her home into a car trunk, existence of car trunk is relevant "not because it is a 'secret' place * * * but because it was " 'another' 'place' to which defendant took the victim[.]").[6] However, because neither isolation nor control of the victim is required by the wording of ORS 163.225(1)(a), those considerations cannot be substituted for the ultimate inquiry whether the victim was moved from one place to another.

---

will dictate the result in other cases. Fact-matching can be a misleading enterprise. Instead, we take our guidance from the legislature's specified criteria, that is, whether a defendant has moved a victim "from one place to another," considered in light of the situation and context in which that issue arises.

[6] As we stated in *Walch*, 346 Or at 482 n 11, we again caution here that "the asportation and confinement elements are not mutually exclusive." Because, in this case, the state charged asportation and not confinement, there is no need to consider whether the evidence in this case would have supported a conviction under the confinement prong of ORS 163.225(1).

With the above framework in mind, we turn to defendant's conduct towards Jeter and Mintun. Jeter and Mintun entered the store of their free will in an attempt to distract or disarm defendant. Defendant's encounter with the pair did not commence until they were already inside the convenience store. Viewing the evidence in the light most favorable to the state, the record indicates that defendant compelled Minton and Jeter to move from some location near the front of the convenience store to the diesel desk at the rear of the store, around the front of the diesel desk counter, and up the ramp to the area behind the diesel desk, a seven-and-one-half foot by eight foot bounded area behind a cashier's desk. He then ordered them to kneel.

We decline to adopt defendant's proposed rule that movement of a victim within a single structure will *never* be place-to-place movement. However, the "situation[ ]" and "context[ ]" of this case do not allow a rational factfinder to conclude that defendant's movement of Jeter and Mintun was from "one place to another." The beginning location (inside a convenience store, near the front door) and the ending location (inside the same room, behind a diesel counter near the back of the room) of defendant's contact with Jeter and Mintun are not "qualitatively different" locations, such that the movement was the sort of change in position from one place to another contemplated by the drafters of the kidnapping statute. Despite the existence of brief physical movements, Jeter and Mintun ended up in the same room of the same building that they had entered. Defendant positioned Jeter and Mintun across the room and behind a desk in a kneeling position. In this context, however, those are changes of position and posture in the same general place, not a movement of victims to a qualitatively different place.

The facts adduced here also demonstrate that the movement of Jeter and Mintun was incidental to—that is, inherent in, or a chance or minor consequence of—defendant's

---

[7] Pursuant to ORS 166.220(1), which sets out the offense of unlawful use of a weapon, the indictment charged that defendant "did unlawfully attempt to use unlawfully against [Mintun and Jeter] a crossbow, a dangerous weapon." The jury found defendant guilty of those charges.

independent crimes of unlawful use of a weapon[7] or menacing[8] against those victims. In light of Jeter and Mintun's refusal to leave, defendant's movement of those two to the area behind the diesel desk was part of defendant's positioning of his victims in a single location so that he could point his crossbow at all three of them simultaneously. Like the defendant's conduct in *Murray*, defendant's conduct in this instance was "not the kind of conduct that the legislature intended to permit to serve as the basis for a separate kidnapping charge."

The foregoing discussion leads us to conclude that the state introduced insufficient evidence to prove the two charges of kidnapping in the second degree.[9] As a result, the trial court erred in denying defendant's motion for judgment of acquittal on those charges. We reverse the trial court's judgment as to those two charges and remand the case to the trial court so that that court can enter a judgment of acquittal as to those charges.

■ Next, we turn to the sufficiency of the evidence as to defendant's first-degree kidnapping conviction for his actions involving Derrick. A defendant commits the offense of kidnapping in the first degree if the state proves the elements required for kidnapping in the second degree[10] and also proves that the defendant acted with additional malevolent purpose specified in ORS 163.235. In part, ORS 163.235 provides:

---

[8] ORS 163.190(1) provides:

"A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury."

The state did not charge defendant with menacing in this case.

[9] On review, the parties also dispute whether the state presented sufficient evidence for a rational trier of fact to conclude that the state had proved the intent element—*i.e.*, defendant's "intent to interfere substantially" with Jeter and Mintun's personal liberty. Because we reverse defendant's second-degree kidnapping convictions on the ground that the state presented insufficient evidence as to the act element, we need not address the sufficiency of the evidence as to the intent element.

[10] Defendant concedes that the state provided sufficient evidence for a trier of fact to have convicted defendant of second-degree kidnapping of Derrick. In other words, he does not dispute that he moved Derrick from one place to another without Derrick's consent with the intent to interfere substantially with Derrick's personal liberty.

"(1)   A person commits the crime of kidnapping in the first degree if the person violates ORS 163.225 with any of the following purposes:

"* * * * *

"(d)   To terrorize the victim or another person * * *[.]"

With respect to defendant's conviction for kidnapping in the first degree, the only issue on review is whether the state presented sufficient evidence for a rational trier of fact to conclude that defendant kidnapped Derrick with the purpose of "terroriz[ing]" him.

The legislature enacted ORS 163.235 as part of the Oregon Criminal Code of 1971, which was a comprehensive revision of Oregon's substantive criminal law. Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 99 (July 1970). Although the word "terrorize" is not defined by statute, the commentary accompanying the Criminal Law Revision Commission's final draft indicates that the legislature intended to adopt the word's plain meaning:

" 'Terrorize' is defined by *Webster's* as meaning 'to fill with terror; to coerce, maintain power, etc. by inducing terror.' The dictionary defines terror as meaning 'intense fear * * * the quality of causing dread; terribleness.' *Webster's New World Dictionary* (Coll ed 1968). The verb form of the word seems particularly apt for use in a kidnapping statute; and the American Law Institute indicates that the term was employed in the Model Penal Code to cover 'vengeful or sadistic abductions accompanied by threats of torture, death or other severely frightening experience.' [Commentary, Tent. Draft no. 11 at 18 (1960)]. Section 99 adopts this view and is concerned with the *intent* or *purpose* of the actor and not with the subjective effect of his actions upon either the person kidnapped or other persons."

*Id.* (ellipsis and brackets in original).

Defendant does not appear to dispute the applicable definition of "terrorize." Rather, he disputes whether the foregoing definition applies to his conduct in this case. He concedes that the evidence may support a conclusion that he kidnapped Derrick with the purpose of frightening him,

embarrassing him, or instilling some fear in him, but he contends that the evidence is insufficient to support the conclusion that he acted with the "different and greater" purpose of terrorizing Derrick.

We disagree. In our view, the state presented sufficient evidence for a rational juror to conclude that defendant kidnapped Derrick with the purpose of terrorizing him, *i.e.*, with the purpose of filling Derrick with intense fear or dread. Viewing the evidence in the light most favorable to the state, the evidence establishes that defendant returned to the store with the express purpose of using a crossbow in order to coerce an apology from Derrick. Defendant maintained power over Derrick by pointing a crossbow at his head at close range and forcing him to kneel in a small, bounded area. Defendant yelled at Derrick, called him names, threatened to harm Derrick and Derrick's daughter, and kicked Derrick in the head. From that conduct, a rational juror could have inferred that defendant's purpose in kidnapping Derrick was to take revenge upon Derrick for Derrick's earlier comments and actions by causing Derrick to undergo a severely frightening experience. Accordingly, we affirm defendant's conviction for kidnapping in the first-degree.

To summarize, we reverse defendant's two convictions for kidnapping in the second degree and affirm defendant's conviction for kidnapping in the first degree.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.