Argued and submitted September 27, 2013, affirmed October 8, 2014, petition for review denied February 19, 2015 (356 Or 767)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DAVID SAMUEL WASHINGTON,
aka David Samuel Washington, Jr.,
*Defendant-Appellant.*

Multnomah County Circuit Court
090431605; A149126

337 P3d 859

Mary M. Reese, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Timothy A. Sylwester, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

**NAKAMOTO, J.**

Defendant appeals from a judgment of conviction on one count each of first-degree rape, ORS 163.375(1); first-degree kidnapping, ORS 163.235(2); and first-degree burglary, ORS 164.225(2).[1] In the first two of five assignments of error, he argues that the trial court erred when it concluded that his prosecution and trial were both timely commenced. Defendant asserts in his third assignment of error that the court erroneously denied his motion for judgment of acquittal on the kidnapping charge because there was insufficient evidence to prove the required elements. For the reasons below, we affirm. We reject without discussion defendant's final two assignments of error, pertaining to his sentencing.

## I. ASPORTATION ELEMENT OF KIDNAPPING

We begin with defendant's assignment of error regarding the trial court's denial of his motion for judgment of acquittal (MJOA) on the kidnapping charge. In reviewing the denial of an MJOA, we state the facts in the light most favorable to the state to determine whether a rational trier of fact could find each element of the charged offense beyond a reasonable doubt. *State v. Opitz*, 256 Or App 521, 523, 301 P3d 946 (2013).

In October 2005, defendant was selling magazine subscriptions door-to-door in the Sellwood neighborhood of Portland. At approximately 5:00 p.m. on October 20, 2005, the victim was at home alone when a neighbor, accompanied by defendant, knocked on the door to her apartment. The neighbor, who spoke little English, explained to the victim that he could not understand what defendant was trying to sell, and asked for the victim's help. After the victim, who also spoke very little English, was unable to help, defendant and the neighbor left.

Defendant subsequently returned, knocked on the door, and when the victim answered, forced his way in, locking the door behind him. The victim screamed. Defendant punched her in the face and stomach. He then dragged the

---

[1] Defendant was charged with, and acquitted of, one additional count, of attempted aggravated murder, ORS 163.095(2)(e).

victim away from the front door, which was surrounded by windows and in close proximity to neighboring units. Defendant dragged the victim up the stairs inside the apartment, continuing to beat her. Defendant tried to force the victim into a bathroom near the top of the stairs. Fearing that defendant would kill her once inside the bathroom, the victim resisted, and defendant ultimately shoved her to the ground outside the bathroom. Defendant began to rape the victim there. When the victim would not stop screaming, defendant shoved a plastic glove into her mouth. Defendant continued assaulting and raping the victim for some time. He eventually left, after threatening to kill the victim if she called the police.

Defendant was ultimately charged with, *inter alia*, kidnapping in the first degree, ORS 163.235. Under ORS 163.235, first-degree kidnapping is defined as an aggravation of kidnapping in the second degree. Second-degree kidnapping is defined by ORS 163.225, which provides:

"(1) A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, the person:

"(a) Takes the person from one place to another; or

"(b) Secretly confines the person in a place where the person is not likely to be found."

Defendant was charged, specifically, under the asportation theory of kidnapping, ORS 163.225(1)(a).

Defendant waived a jury trial, and the case was tried before the court. After the close of the state's evidence, defendant moved for judgment of acquittal on the kidnapping charge, arguing that there was insufficient evidence to permit a rational factfinder to find beyond a reasonable doubt that he took the victim "from one place to another" as required under ORS 163.225(1)(a). According to defendant, the location at the top of the stairs where he raped the victim was not a different "place"—as that term has been interpreted by Oregon's appellate courts in the kidnapping-asportation context—from the location, inside the same dwelling, near the front door where the assault began.

Defendant also argued that his movement of the victim to the second story was incidental to the independent crime of rape because "it was all in furtherance of and all the consequence of the rape."

The state countered that relevant case law supports a conclusion that movement of several feet, even within the same dwelling, may constitute a taking "from one place to another" where, as here, the initial and final locations are sufficiently, qualitatively distinct. Under the state's view, furthermore, defendant's movement of the victim from the front door to the landing at the top of the stairs was not merely incidental to the rape, because "it wasn't necessary for the defendant to move his victim to the second story to effectuate the rape."

The trial court agreed with the state. The court reasoned:

> "After reviewing both the testimony and the photographs of the apartment in this case, I do find that the defendant's dragging the victim upstairs and raping her on the upper level of the apartment was movement to a qualitatively different location and that the movement was not merely incidental to the rape in this case.
>
> "The photographs submitted in evidence * * * show that the front door where the defendant first forced his way into the apartment was surrounded by windows and appears to be in close proximity to the neighbors' homes. One can reasonably infer that by dragging the victim up to the second floor the defendant was looking for a qualitatively different location within the residence that would offer enhanced privacy and concealment. The location of the rape was not simply approximately eight feet away from the entry point of the house, but it was up a fairly steep set of stairs. The fact that the defendant tried to force the victim into the bathroom further demonstrates that defendant's intent was to find a qualitatively different location in which to confine the victim and rape the victim.
>
> "* * * * *
>
> "The decision to drag the victim up the stairs and seek seclusion from a front area of the residence where the defendant initially forced his way in, there's a different find[ing].

It was intended to conceal the event from possible pass-ersby outside and possibly the window, which was right near the front door, so I do not feel that it was incidental but rather it was the attempt to commit the separate crime of kidnapping and it was a different harm."

The parties renew their arguments on appeal. We agree with the state and the trial court.

We first conclude that there was sufficient evidence to permit a reasonable factfinder to find beyond a reasonable doubt that defendant's conduct satisfied the asportation element of ORS 163.225(1)(a), *i.e.*, that he took the victim "from one place to another." We focus initially on the distance that the victim was moved, an "important consideration in determining whether the victim was moved 'from one place to another.'" *State v. Walch*, 346 Or 463, 475, 213 P3d 1201 (2009). "[T]he kidnapping statutes do not require that the victim be moved a 'substantial distance' or, indeed, any specific distance." *Id.* at 476. Instead, a "defendant can be said to have moved the victim from 'one place' to 'another' only when the defendant changes the position of the victim such that, as a matter of situation and context, the victim's ending place is qualitatively different from the victim's starting place." *State v. Sierra*, 349 Or 506, 513, 254 P3d 149 (2010). "[R]elatively minimal movement can satisfy that statutory requirement." *State v. Gerlach*, 255 Or App 614, 618, 300 P3d 193, *rev den*, 353 Or 787 (2013) (citing *Walch*, 346 Or at 463). Thus, the relatively minimal distance that defendant moved the victim in this case, which the trial court determined was approximately eight feet, is not by itself dispositive.

"[A]nother important factor in determining whether the defendant moved the victim 'from one place to another' is whether the movement served to limit the victim's freedom of movement and increase the victim's isolation." *Walch*, 346 Or at 475. In *Walch*, the court held that there was sufficient evidence to permit a reasonable jury to find that the defendant took the victim "from one place to another" for purposes of ORS 163.225(1)(a) when the defendant forced the victim from the driveway, where the defendant began assaulting the victim, to the trunk of a car in that driveway.

346 Or at 476-77. In so holding, the court found it significant that "[t]he victim was originally in the driveway, an open area from which she might have run away or been seen by the people inside the house." *Id.* at 476. The court concluded that, "[b]ecause the context is such that defendant moved the victim from one place (the open driveway) to a qualitatively different, more mobile and isolated place, * * * the asportation element of the kidnapping statute has been satisfied." *Id.*

We similarly conclude that the evidence here demonstrates that defendant moved the victim from an area where she might have been seen by neighbors to a more isolated place at the top of the stairs and that that movement served to limit her freedom and increase her isolation. Such evidence is sufficient to permit a reasonable factfinder to find beyond a reasonable doubt that those two locations were qualitatively different. *Accord State v. Thomas*, 139 Or App 308, 312, 911 P2d 1237, *rev den*, 323 Or 483 (1996) (rejecting rape defendant's MJOA on kidnapping count, after concluding that, "although the distance involved was only 10 to 12 feet, the victim was taken from one place [living room] to another [bathroom] within the meaning of ORS 163.225(1)(a)"); *State v. Dinkel*, 49 Or App 917, 923-24, 621 P2d 626 (1980) (rejecting the defendant's argument that, "because [the victims] inside the house were not taken beyond the house or moved a substantial distance, they were not kidnapped as that term is used in ORS 163.225(1)(a)[,]" and holding that, "[a]lthough the distance involved in this case was minimal, the victims were taken from one place to another").

Defendant cites several cases that he claims buttress his argument that his movement of the victim was insufficient. Specifically, defendant notes that in each of our two most recent cases to consider the asportation element of ORS 163.225(1)(a), *Opitz*, 256 Or App 521, and *State v. Kinslow*, 257 Or App 295, 304 P3d 801 (2013), we held that an assault that occurred in different rooms of the same dwelling did not amount to a taking of the victim "from one place to another." That is correct. But defendant ignores our reasoning in those cases, which actually undercuts his argument.

In *Opitz*, for example, we rejected the state's argument that the different rooms in which the victim was assaulted were qualitatively different, because the movements of the victim had not increased the defendant's interference with the victim's liberty:

"Here, the victim's starting place was the living room of her apartment. Defendant moved her from the living room to the kitchen, from the kitchen to the bathroom, back to living room, and ultimately down the hallway to the bedroom. To be sure, each of those rooms was—as the state emphasizes—*functionally* distinct, but * * * generic functional distinctions do not establish the requisite qualitative difference *vis-à-vis* the commission of the crime of kidnapping. The hallmark of qualitative difference is whether the difference between the starting and ending places promotes or effectuates a substantial interference with another's personal liberty. In the situation and context of this case, the functional differences among the rooms in the victim's apartment had no effect on the extent to which defendant interfered with the victim's personal liberty."

256 Or App at 534-35 (internal quotation marks and citations omitted; emphasis in original). Similarly, in *Kinslow*, we reasoned that the defendant's movement of the victim within a home had not increased control over, or further isolated, the victim:

"[g]iven the situation and context—that is, a day-and-a-half-long assault in defendant's home—there were no qualitative differences between the various rooms of the small house. Whatever functional differences between the living room, kitchen, and bathroom, there was nothing about any one of those rooms that, on these particular facts, increased * * * defendant's control over the victim or further isolated the victim. * * * Thus, as was the case in *Opitz*, the degree of restraint was no different in the bathroom than at the starting place, that is, in the living room."

257 Or App at 303-04 (internal quotation marks and citations omitted).

Given our conclusion that the evidence in this case upholds precisely what was lacking in *Opitz* and *Kinslow*, *i.e.*, that defendant's movement of the victim to the top of the stairs increased defendant's control over, and further

isolated, her, those cases offer additional support for our conclusion that there was sufficient evidence to permit a reasonable factfinder to find beyond a reasonable doubt that the asportation element of ORS 163.225(1)(a) was satisfied.

We turn next to address defendant's argument that his abduction of the victim was incidental to the crime of rape. We disagree. Rather, we conclude, as did the trial court, that defendant's movement of the victim went beyond what was needed to accomplish the independent crime of rape. It is well established that, when a defendant's conduct in abducting a victim evinces an intent to substantially interfere with the victim's personal liberty, that conduct suffices to permit a finding that the abduction is not merely incidental to other related, but independent, crimes. *See, e.g., State v. Mejia*, 348 Or 1, 8, 227 P3d 1139 (2010); *State v. Nguyen*, 221 Or App 440, 447, 190 P3d 462 (2008). In *Mejia*, the defendant, in the course of assaulting the victim in her home, moved the victim from one room within the dwelling to another. After examining legislative history and related case law, the Supreme Court rejected the defendant's argument regarding his MJOA on the count of kidnapping, which was based, in part, on the assertion that the movement of the victim was merely incidental to the assault. The court concluded that

> "there is evidence from which the trier of fact could have found that defendant's acts were more than just incidental to his acts of menacing and assaulting the victim. Defendant moved the victim from her front doorway into her bedroom, took away her cell phone, stifled her screams, physically restrained her, pinned her down and choked her when she attempted to escape, all with the plausible intent to interfere with her liberty. In fact, he *did* interfere with the victim's liberty: He kept the victim confined for about an hour and a half."

*Mejia*, 348 Or at 12 (emphasis in original). Here, as we have already concluded in our analysis of the asportation element, similar evidence in this case is sufficient to permit a factfinder to conclude that defendant intended to, and did, interfere with the victim's liberty, when he dragged her up the stairs before raping her. We thus conclude that the kidnapping was not merely incidental to the rape.

Defendant relies on *Sierra* to support his argument that the trial court erred in concluding both that he took the victim "from one place to another" and that the abduction was not merely incidental to the rape. In *Sierra*, the Supreme Court reversed the defendant's convictions for second-degree kidnapping after holding that (1) the defendant did not move the two relevant victims, Jeter and Mintun, from one place to a qualitatively different place, and (2) that the movement of those victims was merely incidental to other crimes. *Sierra*, 349 Or at 517-18.

The pertinent facts from *Sierra* are as follows:

"Defendant directed Derrick through the rear entrance, around the front of the diesel desk, up the ramp, and made Derrick kneel in the middle of the area behind the diesel desk. Defendant stood in that area, a little to the front of Derrick, in a position that would permit him to monitor the front and rear entrances. Defendant yelled insults at Derrick. *** He threatened to hurt Derrick and his children, and asked Derrick how he would feel if defendant hurt Derrick's daughter in the same way that Derrick had hurt him. At some point, he kicked Derrick in the face, causing a bloody nose.

"Jeter and Mintun, two off-duty employees of a youth correctional facility, had stopped at the truck stop to eat at the adjoining restaurant. They heard a commotion and went into the convenience store to see if they could assist. *** Defendant yelled at Jeter and Mintun to leave. When they refused, defendant pointed the crossbow at them. He directed them to come around the front of the diesel desk and up the ramp to the area behind the diesel desk, and then ordered them to kneel next to Derrick. He then paced back and forth while yelling and pointing his crossbow at all three individuals."

*Id.* at 509-10.

After reviewing prior kidnapping case law, the court stated that, generally,

"the degree by which the movement in question increases [a] defendant's control over the victim, or isolates the victim from the view of others, is relevant to the determination whether a defendant has moved a victim 'from one place to another' *** to the extent that those considerations tend to

demonstrate the qualitative difference between where the victim started * * * and where the victim was as a result of the defendant's conduct * * *."

*Id.* at 516. The court then concluded, first, that the defendant's movement of Jeter and Mintun to a different location in the same room was not a movement to a different place:

> "the 'situation[]' and 'context[]' of this case do not allow a rational factfinder to conclude that defendant's movement of Jeter and Mintun was from 'one place to another.' The beginning location (inside a convenience store, near the front door) and the ending location (inside the same room, behind a diesel counter near the back of the room) of defendant's contact with Jeter and Mintun are not 'qualitatively different' locations, such that the movement was the sort of change in position from one place to another contemplated by the drafters of the kidnapping statute. Despite the existence of brief physical movements, Jeter and Mintun ended up in the same room of the same building that they had entered. Defendant positioned Jeter and Mintun across the room and behind a desk in a kneeling position. In this context, however, those are changes of position and posture in the same general place, not a movement of victims to a qualitatively different place."

*Id.* at 517 (brackets in *Sierra*). The Supreme Court also held that the defendant's movement of Jeter and Mintun was incidental to his use of the cross-bow against them:

> "The facts adduced here also demonstrate that the movement of Jeter and Mintun was incidental to—that is, inherent in, or a chance or minor consequence of—defendant's independent crimes of unlawful use of a weapon or menacing against those victims. In light of Jeter and Mintun's refusal to leave, defendant's movement of those two to the area behind the diesel desk was part of defendant's positioning of his victims in a single location so that he could point his crossbow at all three of them simultaneously."

*Id.* at 517-18 (footnotes omitted).

*Sierra* is distinguishable. First, as is evident from the passages quoted above, the court did not determine—as we have here—that there was sufficient evidence that the defendant's movement of the victims (Jeter and Mintun)

operated to increase the defendant's control over the victims or further isolate them. Rather, the court's analysis turns on the limited extent of the defendant's movement of the victims in the same room, within "the same general place." As the Supreme Court held in *Mejia*, "if the defendant did not move the victim a substantial distance, and there is no other evidence from which a trier of fact may infer an intent to interfere substantially with the victim's personal liberty, then the evidence will not support a conviction for kidnapping." 348 Or at 10. However, as we have already explained above and as was also noted in *Mejia*, "[t]his is not a case in which there was no other evidence[.]" *Id*. The facts in this case are also distinguishable from the facts in *Sierra* in that the defendant's movement of Jeter and Mintun in *Sierra* took place *after* the defendant had already pointed his crossbow at them, thereby committing the crimes of unlawful use of a weapon and menacing *before* moving them. As the court noted, the defendant moved Jeter and Mintun merely "so that" he could then point his crossbow at all three victims simultaneously. That movement was therefore incidental to the other, independent crimes.

The court in *Sierra* compared the defendant's conduct there to the conduct of the defendant in *State v. Murray*, 340 Or 599, 136 P3d 10 (2006): "Like the defendant's conduct in *Murray*, defendant's conduct in this instance was not the kind of conduct that the legislature intended to permit to serve as the basis for a separate kidnapping charge." *Sierra*, 349 Or at 518 (internal quotation marks omitted). The court noted that the defendant in *Murray* had moved the victim from the driver's seat to the passenger's seat to take the victim's car:

> "In *Murray*, the victim was in the driver's seat of her car when the defendant approached, instructed her to '[g]et over' and forcibly pushed her from the driver's seat to the passenger's seat. 340 Or at 601. From there, the victim escaped by exiting through the passenger side door; defendant then drove the car away. *Id*. at 602. The court held that defendant's movement of the victim was insufficient to satisfy the act element of kidnapping by asportation because, even assuming that the movement of the victim from driver's seat to passenger's seat was place-to-place

movement, that movement was incidental to defendant's substantive crime[.]"

*Sierra*, 349 Or at 514. As the Supreme Court articulated in *Murray*, the movement of the victim was incidental to the car theft:

"[N]o evidence indicates that defendant tried to *keep* [the victim] in the car. Instead, defendant drove the car away. That means that, even if one were to find some sort of asportation in the events in question, it was only 'incidental' * * * to defendant's theft of the car and, therefore, not the kind of conduct that the legislature intended to permit to serve as the basis for a separate kidnapping charge."

*Murray*, 340 Or at 606-07 (emphasis in original). The court in *Sierra* contrasted the result in *Murray* with the result in *Walch*, cited above in support of the conclusion that defendant here satisfied the asportation element of kidnapping, and which the court in *Sierra* stated "involved nonincidental movement." *Sierra*, 349 Or at 515.

In contrast to both *Sierra* and *Murray*, defendant's movement of the victim in this case was preliminary to the subsequent rape and decidedly indicated defendant's intent to *keep* the victim under control and isolated. The trial court did not err in denying defendant's MJOA.

## II. STATUTE OF LIMITATIONS

We turn next to defendant's first assignment of error, in which he argues that the trial court erred by denying his motion to dismiss the kidnapping and burglary counts. According to defendant, the prosecution of those counts was time-barred because neither the warrant nor the detainer was executed until after the applicable period of limitation had run, and that delay was unreasonable.

The relevant facts are primarily procedural and are undisputed. On April 10, 2009, defendant, then in prison in Tennessee, was first identified through a DNA match as the perpetrator of the 2005 rape. On April 28, 2009, defendant was indicted, a warrant for his arrest was issued, and Portland police detectives flew to Tennessee and interrogated defendant regarding the allegations against him, including taking a DNA sample from defendant. The following day, the

Multnomah County District Attorney's office initiated placement of a detainer on defendant pursuant to the Interstate Agreement on Detainers (IAD).[2] Tennessee confirmed the detainer on June 1, 2009. As Chitwood, the Multnomah County employee in charge of initiating and processing defendant's detainer, would later testify at trial, once a state has placed a detainer, it is typical for the subject of the detainer to request return to that state within six months.

When, by October 2009, defendant had not, through Article III of the IAD, requested his return to Oregon for trial, the Multnomah County District Attorney's office initiated additional measures under IAD Article IV to have Tennessee return defendant. After subsequently conferring with Tennessee officials, however, the District Attorney's office determined that defendant's term of incarceration was projected to expire before the time required to finalize his return under Article IV. The office, therefore, discontinued its pursuit of defendant's return through the IAD, intending, instead, to extradite defendant following his release from prison in Tennessee.[3]

Defendant was released from prison in Tennessee and transferred to county jail there on February 27, 2010. On approximately March 3, 2010, defendant learned for the first time that Oregon had lodged a detainer against him. Defendant waived extradition the following day. From

[2] A detainer is "a request by the State's criminal justice agency that the institution in which the prisoner is housed hold the prisoner for the agency or notify the agency when release is imminent." *State v. Ayers*, 207 Or App 668, 672, 143 P3d 251, *rev den*, 342 Or 253 (2006) (internal quotation marks omitted). Article III of the IAD "provides the mechanism by which *an inmate* against whom an out-of-state detainer has been lodged may initiate his or her transfer to the other jurisdiction for disposition of the pending charges." *Id.* at 675 (emphasis added). Article III requires the institution housing the prisoner to promptly inform the prisoner of the detainer as well as his right to request final disposition of the indictment on which it is based. *Id.* at 675. "Article IV concerns the means by which *a state* may initiate the return of a prisoner serving time in another state to face charges." *Id.* at 674 n 3 (emphasis added). The IAD does not apply following completion of a prisoner's term of incarceration. *State v. Foster*, 107 Or App 481, 484, 812 P2d 440 (1991).

[3] "Extradition and detainers under the IAD are distinct procedures for bringing a fugitive or other criminal defendant to justice in another jurisdiction. Unlike extradition proceedings, the IAD by its terms applies only to persons currently serving a sentence of imprisonment." *State v. Lewis*, 249 Or App 480, 491, 278 P3d 51, *rev den*, 352 Or 564 (2012) (internal citations omitted).

March 4 through mid-April 2010, federal marshals transported defendant from Tennessee to Oregon. Portland police executed the warrant for defendant's arrest on his arrival in Multnomah County on April 16, 2010.

Before trial, defendant moved to dismiss the kidnapping and burglary charges on the basis that they were time-barred under the three-year statute of limitation applicable to first-degree kidnapping and first-degree burglary, ORS 131.125(6)(a) (2003).[4] The trial court denied the motion. Trial was initially set for June 1, 2010, but was reset seven times, with six of those at defendant's request. The trial ultimately commenced on March 7, 2011, and, as noted, defendant was convicted of first-degree rape, first-degree kidnapping, and first-degree burglary.

There is no dispute on the basic starting and ending points of the limitation period. Under ORS 131.105, "[a] criminal action must be commenced within the period of limitation prescribed in ORS 131.125 to 131.155." For the purposes of ORS 131.125, the limitation period starts to run on the day after the offense is committed. ORS 131.145(1). However, that period tolls while the suspect resides out-of-state. ORS 131.145(2)(a). "A prosecution is commenced when a warrant or other process is issued, provided that the warrant or other process is executed without unreasonable delay." ORS 131.135. The purpose of requiring the state to execute the warrant or other process without unreasonable delay is to ensure that an accused receives adequate notice "of the decision to prosecute and the general nature of the charge so as to allow the accused to prepare evidence and to minimize the prejudice produced by the passage of time." *State v. Barnes*, 66 Or App 896, 898-99, 676 P2d 344 (1984).

Because the three-year statute of limitation was not running during the months that defendant resided out-of-state, the state timely issued a warrant during the limitation period. That is because the crimes charged occurred on October 20, 2005; it is undisputed that defendant did not reside in Oregon between September 2, 2008, and April 24,

---

[4] Since 2003, ORS 131.125 has been amended multiple times. Those amendments do not bear on our analysis. All subsequent citations to ORS 131.125 are to the 2003 version of that statute.

2009, a period of over seven months; and, the state indicted defendant and issued a warrant for his arrest on April 28, 2009, approximately 42 months after the crimes had occurred and approximately one month before the expiration of the limitation period. The state also took two additional steps in late April 2009, within the limitation period: police flew to Tennessee and interviewed defendant regarding the crime and lodged a detainer against him with Tennessee authorities under the IAD. In the trial court, defendant did not dispute that such a detainer may constitute "other process" for purposes of ORS 131.135.

Therefore, the issue before the trial court, now before us on appeal, was whether the warrant or detainer was "executed without unreasonable delay" as required under ORS 131.135. We review the determination of whether a criminal action is timely commenced under the statute of limitation for legal error, *State v. Sauls*, 197 Or App 545, 547, 106 P3d 659 (2005), in light of the trial court's findings of fact, if there is evidence in the record to support them, *State v. Johnson*, 335 Or 511, 73 P3d 282 (2003).

Defendant argued to the trial court that neither the warrant nor detainer was executed until April 16, 2010, the date that he was served with the warrant. According to defendant, the resulting year-long delay between the April 2009 issuance of the warrant and lodging of the detainer and their execution was unreasonable. Defendant also argued that, even if the court were to conclude that the detainer had been executed before the warrant, the execution date of the detainer had to be March 3, 2010, the date that defendant received actual notice of the detainer's existence. And, he argued, the resulting 10 to 11 months of delay between lodging and execution of the detainer was still unreasonable.

The state asserted that defendant's actual knowledge of the detainer was irrelevant and that, therefore, the court should consider the detainer to have been executed, not when defendant received notice of it in March 2010, but rather 10 months earlier, when Oregon initially lodged the detainer with Tennessee. Under the state's view, any failure on Tennessee's part to timely notify defendant of the detainer did not change that result. The state also countered that the

period of delay from issuance of the warrant and lodging of the detainer to execution was reasonable given the circumstances. The state highlighted the gravity of the charges, defendant's incarceration out-of-state, and its attempts soon after identifying defendant as a suspect to lodge a detainer against him.

In denying defendant's motion to dismiss, the trial court determined that "the process at issue pursuant to [ORS 131.135] is the notification of pending charges in Oregon, which would have been the imposition of the detainer filed by Oregon * * *." The court concluded that "the eleven-month period or ten-plus-month period from the indictment on April 28th, 2009, to the actual notice to the defendant on or about March 4th, 2010" was not unreasonable. The court found that

> "the state of Oregon took all necessary and reasonable steps to quickly indict the defendant following the DNA match, and in this case it was extremely quick * * * and then they immediately filed a detainer * * * so unlike some of the other cases, they knew his whereabouts [and] they took action * * * and the evidence shows that the authorities in Tennessee did in fact receive the detainer and confirmed it by June 2009, so at that point the Oregon authorities had done everything that was expected of them under the agreement on interstate detainers."

The court noted further that, "certainly by June 1st, 2009, when Oregon received confirmation of the detainer from Tennessee, one can infer that the detainer was, at a minimum, placed in a law enforcement or jail enforcement system." The court additionally found that, "certainly the officers interviewing the defendant on * * * April 28th, 2009, would have alerted the defendant that he was at least a subject of the investigation at hand, so * * * he was on some notice that there were allegations being raised about him in Oregon[.]"

On appeal, the parties renew their earlier arguments. Defendant maintains that the relevant delay, whether we are considering the warrant or the detainer, is the year-long gap between indictment (April 28, 2009) and defendant's return to Oregon (April 16, 2010), because actual notice, by itself, is insufficient to constitute execution of a warrant or other process. For its part, the state argues

that, whether we use the date on which Oregon placed the detainer, the date on which defendant reportedly learned of the detainer, or the date of defendant's return to Oregon, the trial court correctly found no unreasonable delay in execution of the warrant or detainer. We need not decide which event constituted the execution of process, because even the approximately year-long delay between issuance of the warrant and lodging of the detainer and defendant's return to Oregon did not constitute "unreasonable delay."[5]

In determining whether a delay is "reasonable" for purposes of ORS 131.135, a court looks at the "totality of the circumstances." *State v. Hinkle*, 225 Or App 347, 351, 201 P3d 250, *rev den*, 346 Or 364 (2009); *see also State v. Jackson*, 228 Or 371, 377, 365 P2d 294 (1961) ("[I]t is such length of time as may reasonably be allowed or required having regard to attending circumstances."). In *State v. Chinn*, 115 Or App 662, 665, 840 P2d 92 (1992), we held that the "factors to be considered are the length of the delay, the reasons for the delay and the resulting prejudice, if any, to the defendant." *Accord State v. Green*, 140 Or App 308, 315 n 9, 915 P2d 460 (1996).

In situations where the state is aware of a defendant's location but fails to take any action to execute the warrant or other process, or takes only *de minimis* action, we have found the resulting delay to be unreasonable. In *Barnes*, for example, the warrant was executed more than three years after the date of the alleged offense even though the state knew the defendant's address. Despite that knowledge, the state made no efforts to execute the warrant, other than sending the defendant an unclaimed registered letter. Relying in part on the fact that, as a result, the defendant had "no actual notice of the indictment for three years and four months after the alleged offense[,]" we held that the delay was unreasonable. 66 Or App at 900.

_____

[5] Accordingly, we do not reach the dispute as to whether the shorter gap in time between the lodging of the detainer and defendant's actual knowledge of the detainer was unreasonable and the related question whether such actual notice, by itself, constitutes "execution" of a detainer as "other process." We likewise decline to address, as unnecessary, the parties' dispute as to whether Oregon or Tennessee bore the responsibility for ensuring, after Oregon lodged the detainer, that defendant in fact received notice of it.

By contrast, here, the state took action, as the trial court found. The state lodged a detainer against defendant approximately two weeks after identifying him as a suspect and locating him in Tennessee. As noted above, the state followed standard practices in lodging that detainer under the IAD. When it became apparent that defendant was not requesting his transfer to Oregon under Article III of the IAD, the state took measures to have Tennessee return defendant under Article IV and then promptly pursued defendant's return to Oregon upon his release from prison in Tennessee after learning that his release would occur before the IAD process would be completed. In short, the one-year gap in time between the issuance and execution of the warrant was in large part due to the length of time necessarily required to return defendant, an out-of-state prisoner, to Oregon from Tennessee. In addition, the trial court concluded that defendant had notice of the investigation concerning the rape of the victim by virtue of defendant's interview by the police from Oregon. We conclude that the trial court properly denied defendant's motion to dismiss based on the amount of time involved, the reason for the delay in execution of the warrant, and the state's actions to procure defendant for trial. *Cf. Hinkle*, 225 Or App at 354 (delay of five years in serving an arrest warrant on the out-of-state defendant, who had notice of theft charges, was reasonable).

### III.   SPEEDY TRIAL

We turn finally to defendant's second assignment of error, in which he argues that the trial court erred when it denied his motion to dismiss the indictment pursuant to *former* ORS 135.747 (2011), *repealed by* Or Laws 2013, ch 431, § 1,[6] the "speedy trial" statute. Citing the approximately 10-month gap in time between the indictment and his extradition from

---

[6] *Former* ORS 135.747 provided:

"If a defendant charged with a crime, whose trial has not been postponed upon the application of the defendant or by the consent of the defendant, is not brought to trial within a reasonable period of time, the court shall order the accusatory instrument to be dismissed."

For the reasons explained in *State v. Straughan (A147718)*, 263 Or App 225, 231, 327 P3d 1172 (2014), the repeal of *former* ORS 135.747, which applies to "all criminal proceedings, regardless of whether the case is pending on or the prosecution was initiated before April 1, 2014," does not affect this appeal.

Tennessee and the execution of the arrest warrant, defendant argues that the state failed to bring him to trial in a "reasonable" amount of time. We review for legal error. *State v. Blevins*, 263 Or App 603, 604, 330 P3d 650 (2014) (citing *State v. Johnson*, 339 Or 69, 82-87, 116 P3d 879 (2005)).

In analyzing a statutory speedy trial claim under *former* ORS 135.747, a court first "determine[s] the relevant amount of delay by subtracting from the total delay any periods of delay that defendant requested or consented to." *State v. Glushko/Little*, 351 Or 297, 305, 266 P3d 50 (2011). Second, if the remaining period of delay is longer than to be expected to bring a defendant to trial, a court determines whether that net delay is reasonable. *Id.* Whether a time period is "reasonable" under *former* ORS 135.747 requires an examination of all the attendant circumstances of the delay and, in particular, the circumstances causing the delay. *Id.* at 315-16. The statute applies to both delays between indictment and arrest and between arrest and trial. *State v. Rohlfing*, 155 Or App 127, 130, 963 P2d 87 (1998).

Here, the trial court ruled that the net period of delay attributable to the state was 10 months and was not unreasonable:

"[T]here [was] an approximately 23-month delay between indictment and trial, but * * * the only portion of that that is fairly attributable to the State is * * * just over a ten-month delay, and so looking just at that period of time, this Court does not find that that length of delay * * * was unreasonable."

Defendant accepts that there was a 10-month delay before his arrest that can be attributed to the state; however, he argues that that delay was unreasonable for the same reasons set forth in his assignment of error regarding his motion to dismiss the kidnapping and burglary charges on statute of limitations grounds. For the same reasons that we have rejected those arguments in that context, we reject them as well in this context.[7] We conclude, therefore,

---

[7] We have previously noted, *see State v. Bigelow*, 197 Or App 441, 447 n 6, 106 P3d 162 (2005), that it is proper to look to an analysis of the reasonableness of pretrial delay under ORS 131.135 when assessing that same issue for purposes of speedy-trial challenges under ORS 135.747—at least where, as here, prejudice is not at issue.

that the 10-month delay attributable to the state was not unreasonable.

Affirmed.